Today, as you see, Judge King is not present. She was indisposed and is heroically serving us from her office in Houston. We have every reason to believe that the audio is perfectly fine, though, if she chooses to ask questions. We have read your briefs and record excerpts, but we do appreciate record citations when those are appropriate, and we also appreciate your adhering to the time signals. So your yellow light means you have two minutes, and when the red light comes on, we ask you to conclude unless you're answering a question from the court. And with that, we have the first case of the morning, number 22-50164, Shows and Iglesias. Mr. Lynch. Thank you, Your Honor. May it please the court. I'm here today for Mario Iglesias. Judge King, I'm going to try to remember to speak up. I don't always. I'm going to do my best here. The first issue I want to talk about is the sufficiency of the evidence on Counts 6 and 7. That's the conspiracy to commit V-car murder and the aiding and abetting of V-car murder. And we are, under this court's law, under the Delgado standard because the Rule 29 motion was not denied. It was not renewed. It was denied and then not renewed. I don't think the government proved what they needed to in either of those cases, even under the Delgado standard. What's missing on the conspiracy count in Count 6 is agreement. We have a kidnapping. We have a man being moved around. We have some incidental, I shouldn't use that word, but we have some involvement with Mr. Iglesias at some point in the kidnapping, at least driving Mr. Marufo. We're talking about the Salcedo killing? Yes, the Salcedo killing, yes. But Salcedo ends up back at Figueroa's house. And the only evidence in the record is that Marufo and Figueroa talk about Salcedo and Marufo says kill him. We don't know who killed him. We don't know if anybody else was there besides Figueroa and Marufo. The only evidence of agreement in this record is between Marufo and Figueroa. The government wants us to say, well, because we have evidence that in other cases we know that he was involved in this one. But it's not because he has to know what the agreement is. And the only evidence in the record is that it's just Marufo and Figueroa at that time. There's no evidence that Mr. Iglesias joins an agreement to kill. If you look at the testimony, it really comes down to Figueroa at ROA 2188-92 and 2465-66. And Mr. Figueroa was not hesitant to put the blame for other events on Mr. Iglesias. So the fact that there is no testimony from Figueroa that puts Mr. Iglesias at the scene of where this agreement was made and that Mr. Salcedo had been returned alive to Figueroa's house, which Figueroa and Marufo had control of, there's just nothing there to convict Mr. Iglesias of joining the agreement. The same is true on the aiding and abetting. Because there, what you need, as the Supreme Court told us in Rosamond, is not just an act, because perhaps the government has proven an act in this whole situation because Mr. Iglesias drove Mr. Marufo, and at some point Mr. Salcedo was at a house that was run by Mr. Iglesias. But again, Salcedo is alive back at Figueroa's house. And we don't know that the crime was to murder Mr. Salcedo until Figueroa tells us that happened, Marufo gave that order at his house. Again, no involvement by Mr. Iglesias. And you have to, under Rosamond, to be found guilty, have the requisite intent for the crime intended. And since we don't have any evidence that the crime intended was murder until we're back at Figueroa's house, at which point there's no evidence of Mr. Iglesias. The reason they kidnapped Salcedo was because they thought he had stolen some drugs, right? That's correct. Mishandled cash. That's correct. Right. So what do they usually do with people like that? Well, sometimes they were killed, although usually we can't convict on what might have happened, or what we think might have happened. But I think more importantly here, we know that people who lost loads or owed money were not always killed. Sometimes they were just taken in. Or in the case of government witness, Carlos Gomez, who traded himself for his family members and then was held for a while. And then a deal was made. And he walked out of there alive and he testified for the government later. So the idea that simply because there was a kidnapping, which again, that was Salas, Figueroa, for the most part, but simply because there was a kidnapping that there had to be an intent to murder is just not there. We're at that point convicting him on a pattern that we're seeing, but that the government didn't prove. Well, could the jury could infer the intent from knowing generally what happened? Maybe it didn't always happen, but the jury could infer the intent in this particular time, couldn't it? I don't know that they could. Because again, the only evidence in the record is that Mr. Salcedo leaves Mr. Iglesias' presence and he's still alive. And we don't know. I think that's just guessing at that point. The government has to have something, something to suggest that in this specific case, because we convict people of specific crimes, not of what they might have done or what bad people we think they are. So I don't think there's a specific evidence that we need in this case. Even if we overturn this conviction, it doesn't really change his status, does it? Well, it doesn't. I would love to be able to change his entire status, Your Honor. But that only issue we can do that on. Well, there were about four or five things he was convicted of. Yes. And has a lifetime sentence. That is correct. And I raised on these two points, I think the government's evidence is lacking. And I raised that because I think it's lacking. Similarly, on the money laundering, I don't think you have the agreement. And I spent a very brief time on record sites there. I think that the government cites a number of things in the record. I don't think they get the government there on the money laundering. The sites at record 1337 is about Christian and Figueroa's house. Carlos Gomez, who testifies about money laundering, doesn't mention Iglesias. When he does mention what's an exhibit room, it's a weapons room, not a money's room that the government is citing to. So, again, he's not, Mr. Iglesias on this count isn't convicted of weapons, he's convicted of money laundering. I don't think it gets them there. The, at 1097 that the government cites, this office by Mr. Perez-Piñon, this office was only to guard money. That wasn't Iglesias' office. It was somebody else's office. So just, again, don't think they've shown the agreement. Is the cartel doing all these things? Yes. But the government has RICO for this sort of broad, you're a bad guy who hangs around with bad people. And that was their theory on RICO. It's always their theory on RICO. That's why RICO was passed 50 years ago. But that doesn't mean that the elements for specific offenses fall out. The government still has to prove the specific agreement. I don't believe they did in this case. Judge Jones, to your question, the issue that would reverse or vacate, actually, the rest of Mr. Iglesias' convictions is the suppression issue. That would get us back for a new trial. If counts six and seven go out because they're reversed, the suppression issue would get us back for a new trial without that testimony. And that testimony was important to the government. Government says, well, it's harmless, even if there was a violation. But it wasn't harmless. The government, right off in opening it, record 907 and 08, cites Agent Briano. He's going to tell you things that Mr. Iglesias said. And they do it, again, very near the end of closing argument at 308, 9, and 9-0. Briano tells you. We know he's guilty because what Briano tells us, he said. But overall, the evidence wasn't that strong. And Briano's own testimony is at 979 and 993. And the problem in this case with the statement is that the Mexican officials beat and intimidated Mr. Iglesias. They threatened his family. We're not alleging that Agent Briano, the US agent, did anything wrong. If I accepted that as true, is that enough alone for you to win on the suppression issue? I think it is, because I think that when you are caused to make a statement by beatings, threats, and intimidation, that's not what we expect. Well, all I meant was, if there was a beating, let's say it was a month before the interview with Briano, is that alone enough to reverse on the suppression issue? I think in connection, as I say in the brief, with the way he's treated at the office. Now, it's true. By the federal agents, the United States? No, by the Mexican agent who was at the office. While we're not alleging the US agent did anything untoward. But the Mexican agent would, Mr. Iglesias testified that he was intimidated by them all the way in. He was afraid he was going to get beat again if he didn't speak. And the Mexican agent wouldn't let Agent Briano close the door. He stays in the doorway. And that's sending the message to Mr. Iglesias, as he testified, that you're going to get another beating if you don't do what we think you should do. And that's speak to this guy. I think the two of them. Is there any evidence? You know, this is a prophylactic rule. And the Supreme Court has said, as such, that we have to use it in circumstances where it serves a purpose. And if the American agents had no reason to know whether he had been beaten, I thought the evidence showed that he seemed relaxed. And he did not look as if he had been beaten. Then why do you think that Miranda serves any purpose there? This is not a straight Miranda. The first part of the Heller test, which is also the first part of the test of the Second Circuit used in the terrorist bombing case, is did, if the statement was caused by foreign agents engaging in shocking conduct. So the second part is Miranda, Your Honor, and my time is up. So I think they're different. The first part, the beating, I would say, meets the first part of Heller, the first part of the test that the Second Circuit set out in terrorist bombings. And it's important to remember the privilege against self-incrimination occurs, the violation occurs in court. It doesn't occur there. So if we've got improper statements, the violation doesn't occur till in court. A Miranda violation, which is prophylactic, Your Honor, you're correct, obviously occurs at the time an unfulfilled advisement is not made. OK. All right, next we'll hear from Mr. Solis. Your Honors, Ed Solis for appellant. Arturo Shows-Urquidy. I will address point of error two, and if time allows, which is unlikely, but if time allows, point of error three, in that they're related. First, we would concede that the beating factors do, in fact, control whether there is a single overarching recal conspiracy established or multiple conspiracies established, as we contend occurred with regard to point of error two. The beating factors are the existence of a common goal, the nature of the scheme, and the participants in the activities. I think it's useful, and I think it's instructive, to look at what the recal conspiracy requires as per two cases, Sutherland and Elliott, cited by both the appellant and the government. With regard to the 1962 D recal conspiracy, requires an agreement to conduct or participate in the affairs of the enterprise through a pattern of racketeering. But agreement to conduct or participate in the affairs of the enterprise, and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity. Elliott also instructs that the gravamen of the recal conspiracy is that each agreed to participate in the affairs of the enterprise by committing two or more predicate crimes,  So going back to the Beecham factors and to those conspiratorial agreements that we contend were separate and independent in point of error two, I think I said as many as 22 or 23 instances of what we contend are separate and independent conspiratorial agreements that were populated by opportunistic, expedient in nature type individuals, ad hoc in character, and loosely affiliated. So the existence of a common goal. As the government admits, the common goal for those individuals was about personal gain, I think the government termed it. Personal profit to line their own pockets. So here they have these distinct, separate, and independent conspiratorial agreements, and sometimes they're transitory, sometimes more structured, sometimes they function as to be a source of supply, sometimes they function as to be purchasers of the, and sometimes they mix those two. So that I think undermines the existence of a common goal. Their common goal was not to participate or conduct the affairs of the enterprise, the Sinaloa cartel or other. And it certainly was not to further the enterprise's affairs. Their common goal was to line their pockets. So the nature of the scheme is just that, these loosely affiliated transitory type organizations, and sometimes they're populated by the same members, sometimes different members. There's not this division of labor. There's not this cog that requires the assistance or the success of a different cog to succeed. They are independent and loosely populated by different individuals. So I think for the second factor of the Beecham analysis, it fails there too. It does not establish a single overarching RICO conspiracy, but various conspiracies. As far as the participants in the activities, well again, I think that they're in it for themselves, for personal gain. And that is their motive, that is their common goal. And not to further the activity affairs of the enterprise, undermines the very first factor, that there be that common goal, which I think we contend is that it is to promote or participate in the affairs of the enterprise, and to further the affairs of the enterprise. I think here we've established that there was two, rather multiple conspiracies, and not a single overarching conspiracy. I think it's my time. All right, thank you, sir. Ms. Berenger. May it please the court. Elizabeth Berenger from the Western District of Texas, on behalf of the United States. I'd like to first address the suppression issue a little bit, and address the impact of Heller on this case. Heller does not apply. Heller is a case about statements obtained by foreign agents in foreign countries. And here there is a statement that's not obtained by foreign agents, it's obtained by US agents. And the conduct by Mexican officials, as Judge Duncan's question hinted at, bore no causal connection to the statement. And the district court made a finding on that issue. I guess that is what I was getting at. Is there a factual issue with respect to the relationship between any beating, if there was one, and the statement made to the United States officials? Yes, yes. And so the court found on page 763, the court says, my focus here is the conduct of federal agents. Obviously, if there had been conduct by the Mexican law enforcement, in connection to the taking of a statement that shocked the conscience, that's a different story. But there was none of that. So there's a month that separates the alleged beating from the statement by US agents, different people involved. The Mexicans got their statement. If the government had introduced the statement that the Mexican police had allegedly forced Iglesias to sign, that would be a whole separate question. And maybe Heller would address that issue. But this whole separate framework of Heller providing an alternative framework, providing more protection to foreign suspects interviewed by foreign officers in a foreign country, and giving them greater right, a privilege against self-incrimination, is preposterous. Defendant's argument is that there doesn't even need to be custody in that kind of situation, which is giving foreign suspects a greater right to self-incrimination than US suspects, where the right to the privilege against self-incrimination is only triggered under Miranda in custody. So Heller does not do the work that Defense Counsel is suggesting in its brief. In fact, I couldn't even find the quote that he made on page 12. In Heller itself, foreign officers engaged in shocking conduct that caused the statement to US agents. Nowhere in Heller does a statement by US agents come in other than footnote seven. And that's the only point where we're talking about a statement to US agents. So since Heller doesn't apply, we just apply the normal Miranda determination of was he in custody or was he not in custody? The court found that there were several factors that supported the finding that the Iglesias was not in custody, and that is supported by this court's decision. And remember Foy, it's supported by the Supreme Court's decision in Howell versus Fields and Arianna Spanzuelos. And the important thing in Arianna Spanzuelos, which is a recent decision in 2019, is that the agent used the exact same language and told them that he didn't have to answer the questions. And the court found that those were facts that suggest a person can choose to end the questioning. So another sort of suggestion in the record is that this sort of contributed into the involuntariness of the statement. So we know that that's not true for two reasons. And the first is Colorado versus Connolly. Can a beating by someone other than the US government cause a statement to be involuntary? Well, Colorado versus Connolly suggests no, and the Second Circuit has found that in Salema. But two, again, the connection between the coercive conduct and the statement is so attenuated at this point under cases as Wong-Sun, Mickey versus Tapkin in the Ninth Circuit, that that month-long period, which there was no beating, sort of attenuated any taint from that, the beating. And even if we look at the cases of Howell versus Field, where they talk about the language used to summon the person to the interview. I draw the court's attention to the defendant's own testimony, my record here, on page 750 of the record. And all he was told is, Prosecutor Briones says, the appointment's not with you. He didn't have anything to talk to me about. It was the US agents that wanted to talk to him. So there's no coercion, there's no threat made during that statement at the prosecutor's office. There's no, you better keep talking like you did before a month ago. There's none of that. It's just the US agents want to talk to you. And then when the US agents did, it was all about cooperation and the other factors the court cited. So I'm going to move on to address the sufficiency, unless the court has any additional questions on the suppression issue. There were certainly enough facts in the record to satisfy the devoid of evidence standard for count six and seven. This is the murder of Sergio Saucito. The murder victim, according to the record, and we're drawing all facts in favor of the verdict. That my read of 2-1 to 9-0 to 9-2 is that the murder victim is held and interrogated at a house under Iglesias' control. And there's other places in the record that shows that a person who is in charge of the house controls it and everyone in it, that's many witnesses. Houses are places where kidnapping victims are tortured and killed. That's from 1509. They're soundproof with drains for blood. The role of the person when a kidnapping victim is at their house is to collect information and kill the person. That's from 2545 to 46. Iglesias drove Marufo to the house where the victim was held. That's from 991. Now, this is not him providing a ride to a coworker. He's driving Marufo, who is a man who really likes killing, according to the testimony. That's from 1859. He'd ordered hundreds of other cartel murders. He is Iglesias' boss. He was tasked to clean up the plaza and kill people. That was his whole job. Iglesias admitted that he dumped the body afterward. And we know from Rosamond that the jury could reasonably infer his involvement when your conduct afterward is consistent with knowledge. He knew all the details of the crime, who'd ordered it, who had kidnapped it, where the victim was kidnapped from. And I think a really important piece of evidence is that he's the head of the Sicarios. That's his job. The testimony is that he committed murders three to four times a week. That's from two separate witnesses. Hundreds of murders this man committed. And so when he drives Marufo to this house, a house under his control, and dumps the body afterward, those are certainly facts from which the jury could and that he aided in its commission. Now, defendant has suggested that the government is somehow relying on structure and just any time a leader in a cartel has a leadership role and he commits the conspiracy, he's liable for all the predicate acts. And that is not what the government is saying. The government is saying that the jury could certainly infer from his leadership role and his role in the cartel and his leadership over the house that those factors informed him driving Marufo to the house, him dumping the body, him having knowledge of all of those crimes. So those are all reasonable inferences that the jury can make from the entire trial. Just to briefly address also the money laundering situation, this court's decisions in Virgin, Moreno, and SESA certainly support that a defendant who is heavily involved in the drug trafficking organization itself can form the knowledge and agreement to promote the money laundering crime. And he was, these conspiracies, these agreements can be tacit. They don't have to be made a formal agreement. And there were ample evidence that drug proceeds from the United States were safeguarded in these houses. Yes, it's true that there was a meeting, 1097 to 1101, where Iglesias met Marufo at a house where the proceeds were stored and safeguarded, and so he was certainly aware, even if it wasn't his house. But there's also evidence in the record that the drug proceeds were stored in the houses. There's only three to four houses in the Juarez area, and Iglesias has one of them. So the jury could certainly infer that when we have four different witnesses testifying that proceeds are stored at the houses, that Iglesias' house would also have these proceeds. That was a reasonable inference from which the jury could infer his knowledge. Also his knowledge of the internal operations. He knew who controlled the money for the Juarez cartel. He, and again, his extensive involvement. If the court has any questions on the fine, I'm happy, or any of the other issues, I'm happy to address those. But- On the $100,000 fine? Yes, I would happy. First of all, I would like to say the government's position that this is a clear error situation. Although the defendant did object after the court imposed the fine, it motioned for reconsideration and said he was indigent and he didn't have the ability to pay it. He never objected to the court's finding that his future earnings in BOP could be used to satisfy that fine, and so that's why the government believes. And the two places where he objected is 4523 and 4527, and my reading of that is one is on the basis of indigency, which is present inability to pay the fine. And 4527 is a reasonableness challenge. He said it's unnecessary because of the hardship of his already life sentence and the conditions of his confinement. So nowhere in there does he object, and he has the burden to prove a future inability to pay a fine. So if he had facts, because the PSR said he did have the future ability to pay a fine. He's young, he's healthy, he's gonna be in prison for a very long time. So- He's not gonna be in the general population, is he? I don't know that. I know what prison he's at, but I'm not sure what the conditions of his security is. Is that a secret info, or what prison is, where is he? He's at a high security prison, and right now the name is escaping me. I believe it's Lee in Virginia. Also, if this case was remanded back for further factual- How many more of your prisoners do at the maximum prisons? So this is all not in the record, but I've had a conversation with the BOP, and they sort of gave me information about people who are eligible for the work program. It sounds like he is. But also, this man's had a lot of deposits from the community into his accounts in the past, since he's been in prison. Money grams, hundreds of dollars a month from outside sources that he's getting. So there are multiple ways to satisfy fines. The Inmate Financial Responsibility Program looks into also community contributions. And it's at the low end of the range. It is, it's only 1% of the maximum guideline range. So it is a minimal fine compared to what he could have received. So I would, if the court doesn't have any other questions, I would just ask you to affirm the judgment, other than reforming the judgment to those certain counts that exceed the statutory maximum. You weren't going to address the multiple conspiracy issue? Yes, Your Honor. As far as the multiple conspiracy instruction, the evidence overwhelmingly proved one conspiracy. And this, of course, is in plain error. There was no objection either to the court's instructions. He didn't argue that below or make any sort of suggestion that there was only one conspiracy. All of the evidence at trial pointed to one conspiracy, even if there were different players that moved in and out. This was all the Sinaloa cartel. It was all controlled by Chapo and Zimbada. And this is just a slice in geography and time of the Sinaloa cartel's operations in Juarez from 2000 to 2012. So as far as what the jury could have found, the jury had a wealth of evidence from which to find a single conspiracy in this case. Okay. Thank you. Thank you. All right, Mr. Lynch. On the sufficiency of the evidence on the murders. The government sort of elides a couple of things, or they put something in that maybe is not theirs, more accurate than elides. When they say, oh, Iglesias drove Marufo, that's the first step when Marufo arrives. We don't know how Salcedo got to the house that they refer to as Iglesias' house. We don't know that Iglesias did anything at that house. But most importantly, we don't know, Mr. Iglesias falls out at that point. He didn't drive Salcedo back, which is what I think they're sort of implying. And since we only have evidence that the murder was ordered when it's back at Figueroa's house, and it's Figueroa's house under Figueroa's control and Marufo's control, we don't have the evidence of agreement. And Rosemond does not say, if something happens after and you knew it might have. What Rosemond says is you have to intend the offense that occurs. And that's what's missing here. You can't aid and abet an offense that you don't know is going to occur. That's what Rosemond is about, and that knowledge is lacking here. They didn't prove that he intended murder. So the six and seven, I think, have to fall out. On the plain error standard on the fine, I just think that's wrong. Remember, the fine under the PSR's recommendations, which were adopted by the district court, were in our favor. The PSR specifically said he could not pay a fine within the guideline range. The district court adopted that. Then the district court fined him. And then he said, judge, we object to the fine. You should reconsider that. That's not us not doing it. The government is supposed to, under United States versus Fair 979, Fed Second, and subsequent cases, come forward with evidence when there's a finding, which there was in the pre-sentence report that the court adopted, that he can't pay a guideline fine. Did the PSR say that he had future ability to pay towards a fine? To pay a minimal fine. He could not pay, even future ability, it considered that. And the court adopted that. Could not pay, even with working in prison, a guidelines fine. Guidelines fines start at $25,000. Government talks about $10 million. That's statutory max. That's not what's relevant here. $25,000 is what's relevant here. So that was in our favor. And do you think it's allowable for the district court to consider his ability to earn money in prison to pay towards a fine? I do think this court has said that. But it's a matter, in this case, of how much you can then impose without evidence that the government shows that he can pay within the guideline. Because you've already said, by adopting the pre-sentence report, that he can't pay guidelines fine. And then they turn around and impose a fine that's $75,000 above the bottom of the guidelines without any evidence from the government, any findings from the court, is improper. So we ask the court to vacate, reverse, et cetera, and where appropriate. Thank you. Your Honors, with regard to the overwhelming evidence, I think the evidence will also demonstrate or illustrate that there are multiple conspiracies in play. And one of the most illustrative sites is this, where Mr. Marufo, who's been talked about here several times now, the alleged kingpin, or at least that person in charge of the Juarez Plaza, and presumably distributing all kinds of narcotics, cocaine and marijuana, is at some point supplied by Gomez Muro with cocaine. So here's Marufo, who is allegedly the distributor of narcotics. He turns around to purchase narcotics from Gomez Muro. That illustrates a different, distinct, and separate conspiracy. Mr. Castillo Rascón, he talks about how he is the only person who secures, he's a broker of sorts. He secures narcotics from different sources and distributes them. At points, he is working for Mr. Marufo. But he has his own contacts, as so many others do in the United States, their own clientele to distribute these drugs, their own distribution network. So with regard to the plain error discussion, it's true. Counsel below preserved no error. All of it here is on plain error review. But the multiple conspiracy and single overarching conspiracy argument, I think, involves that that evidence allowed for the transference of guilt from one to another across conspiracy lines, and therefore defining the substantial, the prejudices, the substantial rights of Mr. Sho's Orchidi. That harmed him. And I think there's an obligation to fix or cure that harm. Because at sentencing, what occurred was grouping. So they took all the narcotics involved in that conspiracy and assigned it to conspiracy counts number two and three, and resulted in multiple life sentences. Thank you. All right, thank you, sir. Mr.